UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| MELISSA MADDOX, | ) | Civil Action No.: 4:20-cv-02187-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **ORDER** |
| Kilolo Kijakazi,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for supplemental security income (SSI). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This action is proceeding before the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

## I. RELEVANT BACKGROUND

### A.    Procedural History

Plaintiff filed an application for SSI on March 20, 2017, alleging inability to work since July 30, 2012.[2] (Tr. 12). Her claims were denied initially and upon reconsideration. Thereafter, Plaintiff

---

[1] Kilolo Kijakazi is the Acting Commissioner of Social Security. Pursuant to Fed. R. Civ. P. 25(d), she is automatically substituted for Defendant Andrew Saul who was the Commissioner of Social Security when this action was filed.

[2] SSI is not payable prior to the month following the month in which the application was filed. 20 C.F.R. § 416.335. The ALJ considered the medical history consistent with 20 C.F.R. § 416.912. Defendant also notes the time period is further limited because there was a final ALJ decision on January 29, 2015. 20 C.F.R. § 416.1481; (Tr. 51-74, 76).

filed a request for a hearing. A hearing was held on April 3, 2019, at which time Plaintiff and a vocational expert (VE) testified. The Administrative Law Judge (ALJ) issued an unfavorable decision on June 19, 2019, finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 12-22). Plaintiff filed a request for review of the ALJ's decision, which the Appeals Council denied on April 27, 2020, making the ALJ's decision the Commissioner's final decision. (Tr.1-3). Plaintiff filed an action in this court on June 9, 2020. (ECF No. 1).

**B.**     **Plaintiff's Background and Medical History**

    **1.**     **Introductory Facts**

Plaintiff was born on December 14, 1974, and was forty-two years old on the date the application was filed. Plaintiff had at least a high school education and no past relevant work experience. (Tr. 21). Plaintiff alleges disability originally due to aseptic meningitis, neuropathy, neuromuscular disorder, cyst in spine and neck, PTSD, major depression, colitis, and anxiety. (Tr. 75-76).

    **2.**     **Medical Records and Opinions**

The ALJ found the relevant time period to begin in 2017. (Tr. 22).

**2015**[3]

On April 28, 2015, Plaintiff was seen by PA Haney of Neurosurgical Associates. (Tr. 313). Plaintiff reported dropping things and feeling like she is going to black out if she extends her neck back. Upon exam, Plaintiff was in no apparent distress. (Tr. 313). Plaintiff had stable gait, intact coordination, intact rapid hand movement, and adequate strength in upper extremities. Straight leg

---

[3] Plaintiff discusses 2012 consultative exams and other records before the time period found by the ALJ. While it may be appropriate as background and history of present illness or condition, res judicata generally prohibits relitigation of prior findings and decisions.

raise caused discomfort. Plaintiff had crepitus in shoulders with palpation over the shoulder and rotational movement of the shoulder exacerbating pain. (Tr. 314). Plaintiff needed further imaging since her symptom reports had changed so much. (Tr. 314).

On May 28, 2015, Plaintiff was seen by Dr. Boyer of Neurosurgical Associates. (Tr. 309). "She has a upper thoracic arachnoid cyst, but we had not felt that was the cause of her symptoms." Plaintiff reported emergency room visits, falls, and incontinence since her last visit. Plaintiff reported pain in the right posterior suprascapular region with radiation. Plaintiff reported pain into wrist. (Tr. 309). Plaintiff had full strength in both upper and lower extremities, except diffuse giveaway with right lower extremity. Plaintiff climbed on and off the table without difficulty. (Tr. 309). An MRI was reviewed; she really had no significant bulge, canal, or foraminal stenosis. She had a slight thickening of legmentum flavum at C5/6. (Tr. 309). A thoracic MRI showed dorsal fluid collection at T1-T3 that displaced the cord anteriorly but did not appear to actually compress the cord. "I do not believe that there is any abnormal signal within the cord." (Tr. 310). There was no impingement on the lumbar MRI. (Tr. 310). Plaintiff's cyst was the same as it had been years prior. "Curiously, her symptoms have changed a fair amount and in their location and quality. I do not have an explanation for the original symptoms and I really do not have an explanation for these symptoms. There is really nothing about this thoracic level cyst that would cause pain coming down into the arms." "I do not believe any surgery would likely make her symptoms better." Dr. Miller also confirmed it was not the source of symptoms. "I do not have an explanation for her pain otherwise and it may simply be that there is going to be a pain management issue." (Tr. 310).

**2016**

On December 7, 2016, Plaintiff was seen by Dr. Sauter of Neurosurgical Associates. (Tr.

3

320). Plaintiff complained of "multiple vague symptoms." Plaintiff complained of swelling, numbness, and inflammation. (Tr. 320). Plaintiff had 5/5 strength in all extremities but gave very poor effort. The only thing on the MRIs was a dorsal arachnoid cyst which made the cord a little bit ventral. "It is my impression [Plaintiff ] has multiple vague symptoms, none of which are specific and she has a T2 arachnoid cyst." (Tr. 321). "I told her that I think there is likely nothing I can do for her." (Tr. 321).

**2017**

On February 24, 2017, Plaintiff was seen in the emergency room with left arm and chest pain. (Tr. 612). Plaintiff reported being pain free for seven years and she moved furniture the previous day. (Tr. 612). Plaintiff reported left wrist pain present for two months and was wearing a brace. Upon exam, Plaintiff had nontender back, normal mood, left chest wall with some tenderness to palpation, left upper shoulder with tenderness to palpation, full range of motion, and left wrist tender to palpation. (Tr. 614). Chest x-ray was normal. (Tr. 615). Impression of left wrist imaging was focal soft tissue swelling over the ulnar styloid without associated osseous abnormality. (Tr. 616).

On March 14, 2017, Plaintiff had tenderness, decreased range of motion in lumbar, and anxious, depressed mood. (Tr. 436). Dr. Peacock assessed moderate episode of recurrent major depressive disorder. Plaintiff ran out of depakote and used to be on SSRI; Zoloft, Vistaril, and depakote were prescribed. (Tr. 437). Plaintiff was referred to pain management for pain disorder and low back and neck pain. (Tr. 437).

On March 27, 2017, Plaintiff was seen by Dr. Salwen as a new patient. (Tr. 338). Plaintiff appeared mildly chronically ill. Plaintiff had chest and abdominal discomfort. Plaintiff stated she was an alcoholic in recovery. (Tr. 339). Plaintiff had history of an ulcer in 2011 due to using NSAIDs for

multiple somatic pain complaints. (Tr. 339). Plaintiff had a history of FM and IBS. (Tr. 339). Recent liver chemistries and chest x-ray were normal. (Tr. 339). Upon exam, there was no distress, questionable alcohol on breath, normal neck range of motion, mild tenderness throughout abdomen, normal musculoskeletal, no tenderness, normal range of motion, and skin was abnormal. Plaintiff had normal mood/affect. (Tr. 344). Records were needed before any changes would be made. Plaintiff needed to find a psychiatrist due to her history and report of depression. Plaintiff was scheduled for GI tests. (Tr. 346).

On March 29, 2017, testing showed osteopenia. (Tr. 422).

On March 29, 2017, Plaintiff was seen for depression. (Tr. 444). Dr. Peacock referred Plaintiff to psychiatry. (Tr. 450). Plaintiff reported if she could get her pain symptoms under control she would be doing much better; Plaintiff felt Zoloft was not making a difference. (Tr. 450). Plaintiff reported pain medications helped some. (Tr. 451). Upon exam, Plaintiff had depressed mood and no ideations. (Tr. 453). Plaintiff reported the one thing that helped pain in the past was Valium. Plaintiff was then prescribed Valium but was to see pain management in May. (Tr. 454).

On April 18, 2017, Plaintiff was seen by Dr. Peacock for depression/manic. (Tr. 462). Plaintiff reported being away from some of her medication for two weeks. Plaintiff reported increased mental symptoms. Plaintiff reported having her Valium and Zoloft though. (Tr. 468). Upon exam, Plaintiff had anxious mood, rapid/pressure speech, hyperactive, normal cognition, and no ideations. Plaintiff was attentive and not aggressive. Plaintiff was to restart depakote. (Tr. 471). Valium was increased to 5mg for chronic pain disorder. (Tr. 471).

On April 25, 2017, Plaintiff was seen by Dr. Mullinax for neck pain. (Tr. 558). Plaintiff reported a pain level of seven. Plaintiff reported numbness in her right arm. Plaintiff reported her

pain increased with standing and walking. (Tr. 559). Upon exam, Plaintiff was in no distress, had tenderness to palpation throughout cervical(worse on the right), tenderness in the midline at C5-7, tenderness in the right trapezius, and increased pain with extension but had full range of motion. Plaintiff had equal upper extremity reflexes, negative Hoffmann's and 5/5 strength. Plaintiff had normal gait and tandem walk. Plaintiff had normal mood/affect. (Tr. 563). Drug screen was negative. (Tr. 563). An MRI was ordered. (Tr. 564).

On April 26, 2017, Plaintiff was seen in the emergency room. (Tr. 368). Plaintiff reported she used marijuana one week prior. (Tr. 368). Plaintiff reported an overwhelming feeling without suicidal ideation. Plaintiff was observed on a behavioral hold. Plaintiff requested discharge after eating lunch. (Tr. 370). Wrist imaging showed mild soft tissue thickening but no more than in February 2017. (Tr. 372). Plaintiff's urine test came back as positive for cannabinoid and benzodiazepine. (Tr. 372). Impression was "probable acute exacerbation of impulse control disorder." (Tr. 375). Later, it is noted Plaintiff complained of suicidal and homicidal ideations due to level 10 pain for seven years. (Tr. 376). Upon exam, Plaintiff did not appear ill or in distress. (Tr. 377). Plaintiff had no musculoskeletal tenderness. (Tr. 377). Plaintiff was not agitated or aggressive but exhibited depressed mood and was tearful. (Tr. 378).

On April 30, 2017, Plaintiff was seen in the emergency room for worsening back pain. (Tr. 627). Plaintiff had normal musculoskeletal exam and normal mood/affect. (Tr. 629). Plaintiff reported mild headaches. A CT of Plaintiff's head was normal. (Tr. 632). A lumbar MRI was normal. (Tr. 635). A cervical MRI showed the prior arachnoid cyst. (Tr. 638).

On May 2, 2017, Plaintiff was seen by Dr. Peacock. (Tr. 478). Plaintiff was following up after hospitalization for ideations. Plaintiff reported the "day hold" made it worse but reported no

further ideations. Plaintiff reported they did not provide any of her prescribed medications. Plaintiff and her mother were grieving a loss. (Tr. 486). Upon exam, Plaintiff had no ideations, had depressed mood, normal speech, and was tearful when discussing loss. (Tr. 489). Assessment was bipolar 2 disorder, PTSD, GAD, and was currently stable on medications. (Tr. 489). Gabapentin and Flexeril were prescribed for neuropathy and chronic pain syndrome. (Tr. 489).

On May 17, 2017, Plaintiff was seen by Dr. Peacock. (Tr. 504, 656). Plaintiff reported doing better since setting some personal affairs straight. (Tr. 504). Upon exam, Plaintiff had decreased range of motion, tenderness, pain in cervical, decreased range of motion in lumbar, anxious mood, and tangential speech. (Tr. 507). Mood was stable. (Tr. 508).

On June 5, 2017, nonexamining state agency consultant, Dr. Ward, Ph.D. opined Plaintiff had nonsevere anxiety and obsessive compulsive disorders and a further evaluation could not be had because Plaintiff had not submitted paperwork. (Tr. 79-80). At reconsideration, depressive, bipolar related disorders, trauma and stressor related disorders, substance addiction disorders(drugs), personality and impulse control disorders were severe. (Tr. 98-99).

On July 5, 2017, Plaintiff was seen by Dr. Peacock for a rash on her legs and face. (Tr. 666). Plaintiff reported she scratched her skin when she got anxious. Plaintiff discussed abuse. Plaintiff's mother reported Plaintiff was arrested for intoxication. (Tr. 674). It was noted Plaintiff had been referred to a psychiatrist multiple times but consistently refused to go. Plaintiff was discouraged also because she was not being "prescribed benzos." "Patient feels like she is stable on current medications." Plaintiff was compliant with Depakote and Wellbutrin. (Tr. 674). Upon exam, Plaintiff had anxious mood, rapid/pressure speech, hyperactive, and with superficial excoriations on both extremities with no infection. Assessments were stable and medication was refilled. (Tr. 678).

However, under bipolar later, it was noted "continue to believe that patient's symptoms are not controlled." (Tr. 678).

On July 11, 2017, Plaintiff completed a function report. (Tr. 221). Plaintiff reported she could not stand longer than twenty minutes, could not use her arms to lift, and was constantly nauseous. (Tr. 221). Plaintiff sits most of the day and limits use of her arms. (Tr. 222). Plaintiff's mother and daughter help with things. (Tr. 222). Plaintiff cannot get in and out of the tub without help. Plaintiff does laundry every other week. (Tr. 223). Plaintiff does not drive due to blackouts and pain. (Tr. 224). Plaintiff shops 1-2 times a month. Plaintiff does not spend time with others. (Tr. 225). Plaintiff alleges she can only walk ten feet before needing to rest. (Tr. 226). Plaintiff reported she could pay attention up to an hour depending on pain. (Tr. 226). Plaintiff reported not following instructions well due to being in pain or sick. (Tr. 226). Plaintiff cannot handle stress or change. Plaintiff has fear of being in pain forever and of falling. (Tr. 227). Plaintiff reported medication side effects of sleepiness and dizziness. (Tr. 228). Plaintiff reported changes were decreased mobility of left hand, worsening pain, right hip popping out, right knee tearing, and right ankle deteriorating. (Tr. 230). Plaintiff takes medication for neuropathy, bipolar, muscle spasms, wheezing, blackouts, and pain. Plaintiff reported additional side effects of itching and upset stomach. (Tr. 233).

A July 2017 lumbar MRI was normal. (Tr. 655).

On July 20, 2017, Plaintiff was seen by Dr. Dew. (Tr. 523). Plaintiff reported left wrist pain. Upon exam, Plaintiff had some mild swelling over the distal ulna on the left, extremely tender over that region. Plaintiff had some swelling over the first dorsal compartment; other tests were negative. (Tr. 526). X-rays showed ulnar neutral and no carpal instability/abnormalities in the bone. Plaintiff did have some soft tissue swelling on the ulnar side of her wrist. (Tr. 526). Impression was left wrist

8

pain with orthopedic referral. Plaintiff could have an injury to ECU sheath or a degenerative TFCC tear. An MRI was to be ordered. (Tr. 527).

On August 4, 2017, Plaintiff was seen by Dr. Peacock for worsening rash. Plaintiff reported her anxiety was so high that she continued to pick at lesions without noticing. Plaintiff reported medication side effects of dizzy and agitation. (Tr. 693). Upon exam, skin excoriations had become infected with serous drainage. (Tr. 696). Four medications were prescribed. (Tr. 696). Plaintiff was urged to see psychiatry. (Tr. 697).

On August 8, 2017, Plaintiff was seen by Dr. Mullinax for lower back pain. (Tr. 575, 840). Plaintiff reported a pain level of 7. (Tr. 582). A cervical MRI was in normal limits. (Tr. 582). Plaintiff continued to have weakness and pain in the right upper extremity, but it did not appear to be related to her cervical spine. A neurology referral was made. (Tr. 582). Upon exam, Plaintiff was in no distress, had full range of motion of cervical, and 5/5 strength of upper extremities. Plaintiff had normal mood. (Tr. 586). Plaintiff's drug screen was positive for "canabur" and "benxourql." (Tr. 586–587).

On August 18, 2017, Plaintiff was seen by PA Whitten for chest pain. (Tr. 711). Upon exam, neck had normal range of motion without muscular tenderness. (Tr. 713). Plaintiff had left breast tenderness and diffuse abdominal tenderness to deep palpation. (Tr. 714). Shoulders had decreased range of motion and tenderness. Cervical back had tenderness, pain, and spasm. Thoracic had decreased range of motion and tenderness. (Tr. 714). Back had diffuse musculoskeletal tenderness. (Tr. 714). Plaintiff was prescribed Tylenol#3 for musculoskeletal pain and was told it was a chronic condition that needed to be managed with pain management. Plaintiff was on a wait list for a neurologist. (Tr. 714). Diagnosis was other chest pain and trapezius muscle spasm. (Tr. 715).

On August 30, 2017, Plaintiff was seen by Dr. Peacock for pain. (Tr. 735). It was noted that Plaintiff was followed by pain management, but they could not treat Plaintiff after MRIs did not show an abnormality and she was referred to neurology. Plaintiff reported pain was stable but reported pain between shoulder blades was bothering her. (Tr. 735). Plaintiff reported less mental health symptoms after starting Celexa. (Tr. 735). Upon exam, Plaintiff was in no distress, Plaintiff had tenderness and tissue texture changes between shoulder blades. Plaintiff had depressed anxious mood with tangential speech. (Tr. 739). Dr. Peacock stated she did not feel comfortable prescribing pain medication to Plaintiff given her history. (Tr. 739).

On September 5, 2017, Plaintiff was seen by PA Christensen for pain between her shoulder blades. Plaintiff reported she had a cyst there that limited her ability to function and caused pain. Plaintiff reported Tylenol#3 given by PA Whitten only gave minimal relief. (Tr. 751). "I do not feel comfortable giving this patient pain medication or any controlled substances today after her exam and reviewing her previous visit with Dr. Peacock." Plaintiff was to await an MRI and a necrology followup. Plaintiff refused anti-inflammatories and muscle relaxers. (Tr. 755).

On September 21, 2017, a thoracic MRI showed increased thoracic kyphosis, prominence of the extramedullary, intradural CSF space within the dorsal aspect of the spinal canal extending from T1-4 with persistent compression and mass effect upon the traversing spinal cord with associated mild cord impingement, however the cord signal appears normal. There was no evidence of disc dessication, herniation, canal narrowing, or foraminal stenosis. (Tr. 607-608). Impression was suspected spinal meningeal/arachnoid cyst extending from T1-3 with resultant mass effect, ventral displacement, and mild impingement of upper thoracic spinal cord. (Tr. 608).

On September 27, 2017, Plaintiff was seen by Dr. Peacock. Plaintiff reported pain. Plaintiff

10

had not followed up with psychiatrist. Plaintiff reported she felt better on a reduced dose of Celexa. (Tr. 770). Plaintiff reported doing really well on buspar and that her anxiety has improved. (Tr. 771). Upon exam, Plaintiff had tenderness and tissue texture changes between shoulder blades. Plaintiff had depressed mood. (Tr. 774). Medications were refilled. (Tr. 775).

On October 12, 2017, Plaintiff completed a mobility questionnaire. (Tr. 241). Plaintiff reported excruciating pain all over; sitting, standing, and walking makes it worse. Medication and sleep help sometimes. (Tr. 241). Plaintiff takes medication for pain every day and it makes her sick to her stomach, dizzy, and drowsy. (Tr. 241). Plaintiff reported again that she could only walk ten feet but did not need an assistive device. (Tr. 242). Plaintiff could not brush her teeth or use a pencil or computer. Plaintiff reported having to use both arms to do anything because one cannot support weight alone. (Tr. 242).

On November 9, 2017, Plaintiff was seen by Dr. Peacock for worsening neck pain. (Tr. 795). Plaintiff had seen a neurosurgeon who said it was not a surgical matter and Plaintiff was referred back to pain management who had not called Plaintiff after she left several messages. (Tr. 795). Plaintiff was taking muscle relaxants with some relief. (Tr. 796). Plaintiff was living in an apartment and doing well overall. An MRI showed ventral cord displacement due to cyst. (Tr. 796). Upon exam, Plaintiff had decreased range of motion and spasm with no bony tenderness. (Tr. 799). Plaintiff was given a new pain referral and also offered physical therapy. Plaintiff continued to refuse psychiatry and reported "there is nothing to be done." (Tr. 799).

On December 15, 2017, Plaintiff was seen by Dr. Peacock for neck/back pain. (Tr. 806). Recently, pain management recommended physical therapy. (Tr. 813). "Reports she is in a lot of pain and people keep telling her that she doesn't have a reason for it." Plaintiff had tried multiple

medications all without full relief. Plaintiff reported only pain medications gave relief. (Tr. 813). Upon exam, Plaintiff had decreased range of motion and spasm and no bony tenderness. Plaintiff had depressed mood. (Tr. 816). Plaintiff was willing to try physical therapy after much discussion. Naproxen and Zanaflex were refilled. Plaintiff's bipolar was stable but not fully controlled and Plaintiff refused to go to psychiatry. (Tr. 817).

**2018**

On January 9, 2018, Dr. Taylor, nonexamining state agency consultant, opined a light RFC with never climb ladders, frequently balance, stoop, kneel, crouch, crawl, no manipulative limits, and avoid even moderate exposure to hazards. (Tr. 102-104).

On January 25, 2018, Plaintiff reported physical therapy was helping. (Tr. 827).

On February 3, 2018, Dr. Harper, Ph.D. examined Plaintiff. (Tr. 783). Plaintiff was early and was driven by her mother. Plaintiff ambulated without assistance. (Tr. 783). Plaintiff was cooperative, pleasant, and had good eye contact. "Her ability to focus her attention during the exam was good. Effort on all tasks presented to her was also good." (Tr. 783). Plaintiff reported she could not work because her arms give out, she has neck pain and headaches, and pain makes her depressed. Plaintiff reported crying spells, difficulty concentrating, and fleeting suicidal thoughts. Plaintiff does not get along with her mother. Plaintiff reported periods of elevated mood, excessive talking, and impulsive behavior. (Tr. 783). Plaintiff reported excessive worry and panic attacks 1-2 times a week. Plaintiff reported abuse. Plaintiff reported blacking out and attacking her grandparents when she was 25. Plaintiff reported paranoia. Plaintiff was hospitalized in the past. (Tr. 784). Plaintiff's legal history was extensive, having been arrested fourteen times, mainly for intoxication. Plaintiff reported marijuana use 1-2 times a week. Plaintiff can bathe and dress independently. (Tr. 785). Plaintiff

washes dishes, takes out the trash, and does laundry, but does not sweep/mop. One note from Dr. Peacock was reviewed. (Tr. 786). Upon exam, speech was spontaneous, a bit rapid, but not pressured. Plaintiff had mildly depressed, anxious mood. Plaintiff could recall 3/3 objects after delay. Intellectual functioning was in the average range. Impressions were unspecified bipolar and related disorder, GAD, panic disorder, PTSD, alcohol use disorder, and cannabis use disorder. (Tr. 786). "I suspect that some of her reluctance to leave her room has to do with the tensions in her relationship with her mother, with whom she is living. The claimant still shops for necessities and does chores. She manages her medicines on her own. There appear to be no more than moderate limitations in independent functioning." (Tr. 787). Plaintiff was capable of interacting appropriately with coworkers and supervisors in a work setting but might function best in a job that does not require interaction with the pubic. Plaintiff had moderate limitations in social functioning. Plaintiff was able to understand and carry out simple instructions but had difficulty with more complex ones. Plaintiff focused her attention well. Plaintiff had no more than moderate limitations in cognitive functioning. It is noted substance abuse appeared to be ongoing. (Tr. 787).

On March 9, 2018, Dr. Clanton, Ph.D., nonexamining state agency consultant, opined Plaintiff could understand and remember simple and detailed instructions, was moderately limited in carrying out detailed instructions but not significantly limited in attention and concentration, ordinary routine, working with others, or completing a normal workweek. (Tr. 106). Plaintiff was able to maintain concentration and attention for periods of at least two hours. (Tr. 106). Plaintiff would perform best in settings without ongoing public interaction. (Tr. 106). Plaintiff would be able to respond appropriately to supervisors and coworkers. (Tr. 106).

On November 30, 2018, Plaintiff presented to the emergency room and was diagnosed with

left leg pain. (Tr. 851).

**2019**

On March 1, 2019, Dr. Peacock wrote a letter: "Due to severe disability due to both mental and physical ailments, patient has been unable to work. Specifically has an arachnoid thoracic cyst which has caused loss of shoulder mobility, generalized anxiety, and PTSD." (Tr. 854).

C.    **The Administrative Proceedings**

1.    **The Administrative Hearing**

a.    **Plaintiff's Testimony**

On April 3, 2019, Plaintiff appeared at a hearing before ALJ John E. Case. Plaintiff was represented by an attorney. (Tr. 34). Julia Russell testified as an impartial vocational expert (VE). (Tr. 28).

Plaintiff testified she could not work because her right arm started acting up and surgery made it worse. Plaintiff stated there was nothing between her arm and shoulder holding her arm on. Plaintiff stated her wrist would not hold weight and her shoulder socket was like a dolls' and it could pull out and not go back in. (Tr. 32). The pain runs to her neck and head and sometimes causes her to vomit. (Tr. 33). Plaintiff reported during a typical day, she is in pain, takes medication, and sits for three hours to get where she can eat her bland diet. After she eats, she tries to bathe, and if she cannot bathe, she takes a nap. (Tr. 34). Plaintiff's mother shops for her. (Tr. 35). Plaintiff had meningitis in the past. (Tr. 35). Plaintiff cannot pick up milk out of the fridge. Plaintiff cannot stand for long or raise her hands to do her hair. Plaintiff testified she was diagnosed with FM. (Tr. 36). Plaintiff reported her whole body hurt. (Tr. 37). The cyst in her spine was found in 2012 or 2013. (Tr. 37). It was full of spinal fluid and there was no surgery possible. (Tr. 37). Plaintiff had mental

14

health treatment. (Tr. 38). Plaintiff sometimes feels paralyzed by her mental issues. (Tr. 39). Plaintiff is constantly worried she will run into someone who hurt her. (Tr. 40). Plaintiff reported past drinking problems. (Tr. 41). Plaintiff reported "it helps to the point I don't even smoke a cigarette. It helps that much." It is unclear what "it" is and the next question is about self-medicating. (Tr. 42). Plaintiff is afraid of going places. (Tr. 42). Being around people makes her sick to her stomach. (Tr. 43). "I went to jail and not know why I was there. I blacked out and tried to kill people. I've destroyed stuff and not had any recollection of it at all." (Tr. 43). Plaintiff gets angry with any perceived abuse of anyone. (Tr. 43). Gabapentin made her feel drowsy, dizzy, and doped but did help her to be able to sit still without feeling pins and needles. (Tr. 43). Plaintiff can no longer play instruments, paint, draw, or garden. (Tr. 43-44). Plaintiff cannot drive because she cannot turn her neck. (Tr. 44). Plaintiff hides in her room because she cannot control her feelings around others. (Tr. 44). Plaintiff's pain is exacerbated when her potassium or Vitamin D is low and her muscles draw up and her bones ache and pop uncontrollably. (Tr. 45).

### b. Vocational Evidence

The VE opined that Plaintiff could perform the jobs of bench worker, document preparer, and sealer considering an individual of Plaintiff's age, education, and prior work history, and limitations of sedentary, no overhead reaching, simple, non-complex tasks, no work with the public, no more than occasional interaction with coworkers and supervisors, stable work environment, going to the same place, working around the same people, and performing the same tasks. (Tr. 46). Adding occasional use of upper extremities made all sedentary jobs not available. (Tr. 46-47). If offtask one hour of workday, no work was available. One day absence a month was tolerable but not more. (Tr. 47).

15

### 2.     The ALJ's Decision

In the decision of June 19, 2019, the ALJ made the following findings of fact and conclusions

of law (Tr. 12-22):

1.     The claimant has not engaged in substantial gainful activity since March 20, 2017, the application date (20 CFR 416.971 *et seq.*).

2.     The claimant has the following severe impairments: degenerative disc disease; arachnoid cyst; chronic pain syndrome; bipolar disorder; general anxiety disorder; posttraumatic stress disorder; alcohol disorder; cannabis use disorder; borderline personality disorder (20 CFR 416.920(c)).

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except she could perform no overhead reaching. The claimant is limited to simple, non-complex tasks, but no work with the public. The claimant could have no more than occasionally interaction with coworkers and supervisors. The claimant is limited to a stable work environment with the same people, places and tasks.

5.     The claimant has no past relevant work (20 CFR 416.965).

6.     The claimant was born on December 14, 1974 and was 42 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.     The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since March 20, 2017, the date the application was filed (20 CFR 416.920(g)).

## II. DISCUSSION

Plaintiff argues the ALJ erred in weighing Dr. Peacock's opinions. Plaintiff argues the ALJ erred in weighing non-examining and examining consultants' opinions. Plaintiff argues the ALJ erred in considering upper extremity ailments. Plaintiff argues the ALJ failed to consider Plaintiff's impairments in combination. Plaintiff argues the RFC is not supported by substantial evidence that Plaintiff could perform sedentary work on a regular and sustained basis.

The Commissioner argues that the ALJ's decision is supported by substantial evidence.

## A.    LEGAL FRAMEWORK

### 1.    The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims). An examiner must consider the

17

following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents him from doing SGA.  *See* 20 C.F.R. § 404.1520.  These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982).  The claimant bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do.  The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii).  To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653

(4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound

foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d

at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial

evidence to support the decision of the Commissioner, that decision must be affirmed "even should

the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

Substantial evidence as a threshold is "not high;" "[u]nder the substantial-evidence standard, a court

looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to

support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

## B.    ANALYSIS

### Opinions

Plaintiff argues the ALJ erred in weighing Dr. Peacock's opinions. Plaintiff argues the ALJ

erred in weighing non-examining and examining consultants' opinions.

The Social Security Administration's regulations provide that "[r]egardless of its source, we

will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Generally, more weight

is given to the opinions of examining physicians than nonexamining physicians. More weight is

given to the opinions of treating physicians since they are more likely to be able to provide a

detailed, longitudinal picture of a claimant's medical impairment. *See* 20 C.F.R. § 404.1527(c). The

medical opinion of a treating physician is entitled to controlling weight, i.e., it must be adopted by

the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. §

404.1527(c)(2), SSR 96-2p, and *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y

negative implication, if a physician's opinion is not supported by clinical evidence, it should be

accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585,590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178 (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

In determining what weight to give the opinions of medical sources, the ALJ applies the factors in 20 C.F.R. § 404.1527(c)(1)-(6),[6] which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. *See* SSR 96-2p; *Hines v. Barnhart*, 453 Fd 559,563 (4th Cir. 2006). The ALJ considers the evidence in the record as a whole when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's decision. *See Craig*, 76 F.3d at 595.

Even when a treating opinion is not entitled to controlling weight, "it does not follow that the ALJ ha[s] free reign to attach whatever weight to that opinion that he deem[s] fit." *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 385 (4th Cir. 2021). It must be "apparent from the ALJ's decision that he meaningfully considered each of the factors before deciding how much weight to give the opinion." *Id.* The Fourth Circuit Court of Appeals found where only the factors of supportability and consistency were discussed by the ALJ and other factors of length, frequency,

---

[6] For applications filed on or after March 27, 2017, the regulatory framework for considering and articulating the value of medical opinions is different. *See* 20 C.F.R. § 404.1520c; *see also* 82 Fed. Reg. 5844-01, 2017 WL 168819 (revisions to medical evidence rules dated Jan. 18, 2017, and effective for claims filed after Mar. 27, 2017). Plaintiff's application was filed before March 27, 2017.

4:20-cv-02187-TER    Date Filed 11/10/21    Entry Number 41    Page 22 of 32

nature, and extent of treating relationship were ignored, it was error necessitating remand. *Id.* "20 C.F.R. § 404.1527(c) requires ALJs to consider *all* of the enumerated factors in deciding what weight to give a medical opinion." *Arakas v. Comm'r of Soc. Sec. Admin.*, 983 F.3d 83, 107 n.16 (emphasis in original).

<u>Dr. Peacock</u>

On March 1, 2019, Dr. Peacock wrote a letter: "Due to severe disability due to both mental and physical ailments, patient has been unable to work. Specifically has an arachnoid thoracic cyst which has caused loss of shoulder mobility, generalized anxiety and PTSD." (Tr. 854).

The ALJ found:

> In March 2019, Brittany Peacock, D.O., opined due to the claimant's mental and physical ailments the claimant is unable to work (Exhibit B16F/1 ). Furthermore, she noted due to the claimant's arachnoid thoracic cyst, the claimant had loss of shoulder mobility and mental limitations. Little weight is given to this opinion because the limitations are not supported by sufficient explanation of the medical record.

(Tr. 20).

In reviewing the ALJ's opinion as a whole as required, the ALJ, before assigning weight to Dr. Peacock's opinion, thoroughly summarized both objective and subjective evidence, citing specific exhibit pages numbers as support. (Tr. 16-20). The ALJ reviewed Plaintiff's reports and hearing testimony as to the reasons she was unable to work. (Tr. 16-17). The ALJ then considered objective imaging, citing Exhibits B8F/4 and B3F/3. (Tr. 17). The ALJ discussed exams from Dr. Miller. (Tr. 17). The ALJ reviewed exams from 2015 from Dr. Boyer, citing specific exhibit pages. (Tr. 18). The ALJ noted Dr. Boyer stated the cord was displaced by Plaintiff's cyst but did not appear to compress the cord and the cyst was not the cause of her radiating pain and there was no surgery need. (Tr. 18). The ALJ noted several exams of full strength as well as abnormalities such as crepitus

22

in shoulder and discomfort with flexion/extension. The ALJ considered Dr. Sauter's statement that nothing could be done for Plaintiff's vague multiple symptoms. (Tr. 18).[7] The ALJ noted continued conservative treatment in 2017 with normal exams of full range of motion and tandem walk but abnormals of tenderness to palpation. The ALJ considered imaging of mild impingement of thoracic spinal cord. (Tr. 18). The ALJ discussed mental impairments, Plaintiff's reports, and exams. (Tr. 19).

The ALJ's reason for little weight—that Dr. Peacock's opinion was not supported with sufficient explanation— is in line with the regulations that state the "better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion." 20 C.F.R. § 416.927(c)(3).

The standard of review here is not whether conflicting evidence might have resulted in a contrary decision, but it is whether substantial evidence supports the ALJ's decision.[8] Even with some evidence of abnormal reports, the ALJ provided more than a mere scintilla of record support for the weight given to Dr. Peacock's opinion. The ALJ complied with the applicable regulations in making clear to a subsequent reviewer the reasons for the findings made. The ALJs decision was based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).

---

[7] Specific notes mentioned by the ALJ within the relevant time period have been summarized by the court above in the appropriate fact section.

[8] Even if error were assumed here, there is no outcome determinative error because Dr. Peacock did not opine any specific functional limitations and Dr. Peacock's statement generally that Plaintiff was unable to work is an issue reserved for the commissioner. 20 C.F.R. § 416.927(d)(1), (3)("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner.").

State Agency Consultants

Plaintiff argues: "The ALJ committed reversible error by according more weight to the non-examining, non-treating, and one-time examining state agency consultants than the weight given to the **reports** of the treating physicians and the statement of disability of Dr. Peacock. As already discussed above, substantial evidence supports the weight the ALJ gave to Dr. Peacock's statement.

The non-examining and examining opinions are as follows.

On January 9, 2018, Dr. Taylor, a nonexamining state agency consultant, opined a light RFC with never climb ladders, frequently balance, stoop, kneel, crouch, crawl, no manipulative limits, and avoid even moderate exposure to hazards. (Tr. 102-104).

The ALJ found:

Medical consultant, James Taylor, D.O. for the State agency completed a physical residual functional capacity assessment and found the claimant could perform light work with additional postural and environmental limitations (Exhibit B7A/13-16). Partial weight is given to this opinion because evidence received at the hearing level, including the claimant's history of shoulder surgery prior to the applications date, warrant additional limitations.

(Tr. 20).

On March 9, 2018, Dr. Clanton, Ph.D., nonexamining state agency consultant, opined Plaintiff could understand and remember simple and detailed instructions, was moderately limited in carrying out detailed instructions but not significantly limited in attention and concentration, ordinary routine, working with others, or completing a normal workweek. (Tr. 106). Plaintiff was able to maintain concentration and attention for periods of at least two hours. (Tr. 106). Plaintiff would perform best in settings without ongoing public interaction. (Tr. 106). Plaintiff would be able to respond appropriately to supervisors and coworkers. (Tr. 106).

24

As to Dr. Clanton, the ALJ found:

Regarding her mental impairments, psychological consultant Larry Clanton, Ph.D., performed a mental residual functional capacity assessment and found the claimant's impairments were severe, but would not preclude the performance of simple, repetitive work in situations that do not require on-going interaction with the public. Great weight is given to this opinion because the findings are consistent with the objective evidence of the record and the opinion of Dr. Harper.

(Tr. 20).

On February 3, 2018, Dr. Harper, Ph.D. examined Plaintiff. (Tr. 783). Impressions were

unspecified bipolar and related disorder, GAD, panic disorder, PTSD, alcohol use disorder, and

cannabis use disorder. (Tr. 786). "I suspect that some of her reluctance to leave her room has to do

with the tensions in her relationship with her mother, with whom she is living. The claimant still

shops for necessities and does chores. She manages her medicines on her own. There appear to be

no more than moderate limitations in independent functioning." (Tr. 787). Plaintiff was capable of

interacting appropriately with coworkers and supervisors in a work setting but might function best

in a job that does not require interaction with the pubic. Plaintiff had moderate limitations in social

functioning. Plaintiff was able to understand and carry out simple instructions but had difficulty with

more complex ones. Plaintiff  focused her attention well. Plaintiff had no more than moderate

limitations in cognitive functioning. It is noted substance abuse appeared to be ongoing. (Tr. 787).

As to examining consultant Dr. Harper, the ALJ found:

In February 2018, the claimant underwent a consultative examination with Renuka Harper, Ph.D., at the request of the State agency (Exhibit B12F/1). On observation, the claimant ambulated without assistance and she appeared clean, although she smelled of cigarette smoke (Exhibit B12F/1). The claimant reported she maintain the ability to perform her daily activities, including dressing and taking a bathe. Furthermore, the claimant maintained the ability to manage her medications on her own, clean her home, cook, care for her cat and do laundry (Exhibit B12F/3). The claimant admitted she smokes marijuana one to two times per week because it helps

to keep her calm and eat, but she reported she only drank when she was angry (Exhibit B12F/2). The claimant was cooperative and pleasant, her eye contact was good and her ability to focus was good.

On examination, Dr. Harper noted the claimant was alert, fully oriented and spontaneous speech (Exhibit B12F/4). The claimant's thoughts were logical, goal-directed and she denied hallucinations. The claimant had psychomotor activity was normal, but h[er] mood was mildly depressed and anxious with a congruent affect. The claimant was unable to serially subtract sevens from one hundred, but she could perform three calculations of serial threes. In addition, the claimant repeated seven digits forward and only three backward, but she could complete simple addition, subtraction, multiplication and division correctly. Demonstrating intact memory and the ability to carry out tasks. The claimant was also able to recall spontaneously three of three objects after five minutes. Considering the objective evidence, Dr. Harper diagnosed the claimant with unspecified bipolar and related disorder, generalized anxiety disorder, panic disorder, PTSD, alcohol use disorder and cannabis use disorder (Exhibit B12F/4).

Based on the examination, Dr. Harper found the claimant had no more than moderate limitations in her independent functioning, as she maintained the ability to cook, shop for groceries, manage her medications and relate well during the examination (Exhibit B12F/5). Furthermore, she appeared capable of interacting appropriately with coworkers and supervisors in a work setting, but she could function best with a job that does not require interaction the public. However, she had moderate limitations in social functioning. Dr. Harper noted the claimant was able to understand and carry out simple instructions, but difficulty with more complex tasks. Moreover, she had no more than moderate limitations in cognitive functioning. Great weight is given to this opinion because the limitations are supported by the objective results of the examination. Furthermore, the findings are consistent with the limited mental health treatment.

(Tr. 19-20).

State agency medical consultants "are highly qualified ...who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled." 20 C.F.R. § 404.1527(e).

26

As demonstrated above, in analyzing each of the consultants' opinions, the ALJ considered the appropriate regulatory factors and cited to substantial evidence in support of the weights assigned to such opinions.

As to Plaintiff's arguments that: "The ALJ failed to analyze, discuss, or indicate the weight assigned to the treatment records of Dr. Peacock" and "did not expressly state the weight given to the records of Neurosurgical Associates," such is not required under the applicable case law and regulations. (ECF No. 20 at 20-21). "The administrative law judge must afford this greater weight only to a medical *opinion* from a treating physician, not all medical evidence in a physician's file or statement." *Britt v. Saul*, No. 19-2177, 2021 WL 2181704, at *4 (4th Cir. May 28, 2021)(citing 20 C.F.R. §§ 404.1527(c), 416.927(c); *Dowling*, 986 F.3d at 384; *Arakas*, 983 F.3d at 106–07). "It is the medical opinion—reflecting medical judgment about the nature and severity of a claimant's symptoms, diagnoses, or limitations—and not statements recounting facts or a claimant's subjective complaints that is entitled to greater weight. The information on which Britt seeks to rely—such as mere observations and her recorded subjective complaints during office visits—contains no medical judgment, which is the essence of medical opinions. " *Id.* There is no error in not "weighing" medical evidence because an ALJ is only required to attribute weight to a treating doctor's medical opinions. *Id.* There is no error here where the ALJ did not weigh Dr. Peacock's records.

**Upper Extremity and Cervical**

Plaintiff argues the ALJ erred in considering upper extremity and cervical ailments.

A severe impairment is defined by the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Plaintiff bears the burden of demonstrating that she has a severe

impairment. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). However, "'[a]n impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir.1984) (*quoting Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir.1984)). The severe impairment inquiry "is a de minimis screening device to dispose of groundless claims." *McCrea v. Comm'r*, 370 F.3d 357, 360 (3rd Cir. 2004) (citation omitted). A finding of a single severe impairment at step two of the sequential evaluation is enough to ensure that the factfinder will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir.2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence.").

The ALJ made no express finding as to any upper extremity and cervical ailments, except finding degenerative disc disease, arachnoid cyst, and chronic pain syndrome as severe. (Tr. 14). Despite no express finding as to Plaintiff's upper extremity, evidence concerning the upper extremity was discussed by the ALJ in formulating the RFC. The ALJ considered Plaintiff's allegations that she was limited in ability to reach and use her hands, citing Exhibit B3E/6. (Tr. 16). The ALJ considered Plaintiff's testimony that her arms hurt when she held things, the pain radiated, she had pain/spasms when she used her arm, she could not hold a pot or lift a gallon, and her neck hurt. (Tr. 17). The ALJ considered wrist images of no abnormality and images of minor disc bulging at C4-5 without impingement or stenosis. (Tr. 17). The ALJ considered exams of full strength in upper extremity. (Tr. 17,18). The ALJ considered multiple doctor statements that the cyst did not explain shoulder pain. The ALJ discussed abnormal findings of crepitus in shoulder and discomfort with

28

flexion/extension of neck and doctor statements that nothing could be done for Plaintiff's multiple vague symptoms including arm numbness. (Tr. 18). Plaintiff's pain was treated conservatively with gabapentin and valium. (Tr. 18). The ALJ noted the RFC finding was based on some upper extremity and neck/cervical findings: "This modified sedentary residual functional capacity addresses the claimant's degeneration of her spine, arachnoid cyst, crepitus of her shoulders, discomfort with range of motion in her neck and lower back. Furthermore, the residual functional capacity redresses the claimant's decreased range of motion of her cervical spine, pain to palpation over her spine, radiating pain in the upper extremities, difficulty concentrating, impaired memory, constrained social interactions and delayed cognitive functioning." (Tr. 20).

Substantial evidence supports the ALJ's consideration of Plaintiff's ailments; if it was any error in not making express findings as to Plaintiff's upper extremity and cervical, it was harmless error as the ALJ provided discussion related to the RFC determination concerning the upper extremity and cervical/neck.

**Combination**

Plaintiff argues the ALJ failed to consider Plaintiff's impairments in combination.

When a claimant has more than one impairment, the Commissioner "must consider the combined effect of a claimant's impairments and not fragmentize them." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). (citations omitted). The ALJ is required to "adequately explain his or her evaluation of the combined effects of the impairments." *Id.* This court must uphold the Commissioner's decision as long as it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Regulations require that an ALJ "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe," in determining the claimant's

29

RFC.   20 C.F.R. § 416.945(e); *see also* SSR 96–8p ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' ").

It is evident from the ALJ's discussion that the ALJ considered Plaintiff's various multiple ailments. (Tr. 15, 16-21).  The ALJ's discussion and analysis, as a whole, is sufficient to demonstrate that he considered the Plaintiff's impairments in combination and is sufficient for the court to properly review the ALJ's conclusion on this issue.  *See Thornsberry v. Astrue*, 2010 WL 146483, *5 (D.S.C. Jan. 12, 2010) and *Brown v. Astrue*, 2012 WL 3716792, *6 (D.S.C. Aug. 28, 2012). The ALJ sufficiently addressed Plaintiff's combined impairments under the *Walker* standard and there is substantial evidence to support the ALJ's decision in this regard.

**RFC**

Plaintiff argues the RFC is not supported by substantial evidence that Plaintiff could perform sedentary work on a regular and sustained basis.

An adjudicator is solely responsible for assessing a claimant's RFC.  20 C.F.R. § 416.946(c). In making that assessment, he must consider the functional limitations resulting from the claimant's medically determinable impairments.  Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2.  This ruling provides that: "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96–8, *7.  "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  *Id.*    Additionally, " 'a necessary predicate to engaging in a substantial evidence review is a record of the basis for the ALJ's ruling,' including 'a discussion of

which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence.' " *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (*quoting Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)).  The ALJ considers the evidence in the record as a whole when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's decision.  *See Craig*, 76 F.3d at 595.

As already discussed in the issue of opinions above, in formulating the RFC, the ALJ considered Plaintiff's allegations, subjective reports, objective evidence, and opinions. (Tr. 16-21). The ALJ supported the functional limitations found in the ALJ's RFC determination with discussion and citation to substantial evidence in the record. An RFC is "an administrative assessment made by the Commissioner based on all the relevant evidence in the case record." *Felton-Miller v. Astrue*, 459 Fed. Appx. 226, 230-31 (4th Cir. 2011) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).  Based upon the foregoing,  substantial evidence supports the ALJ's RFC.

As to Plaintiff's argument that Dr. Peacock's opinion is inconsistent with sedentary work on a sustained basis, the issue of Dr. Peacock's opinion has already been discussed above and the ALJ's assignment of little weight is supported by substantial evidence. As to Plaintiff's argument that vocationally, Plaintiff's limited education, lack of transferrable skills, inability to drive, and poor work history cause her to be a poor candidate for work on a regular basis, appropriately the ALJ was assisted by VE testimony as to the extent of erosion of the unskilled sedentary occupational base for an individual with Plaintiff's age, education, work experience, and RFC, and the VE and the ALJ found three job categories available. (Tr. 21-22).  The RFC and Step Five findings were supported by citation to substantial evidence.

## III. CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. *Richardson*, 402 U.S. at 390. Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock*, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). As previously discussed, despite the Plaintiff's claims, he has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, and pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), the Commissioner's decision is AFFIRMED.

<u>s/ Thomas E. Rogers, III</u>

November 10, 2021                    Thomas E. Rogers, III
Florence, South Carolina             United States Magistrate Judge

32